The Charles E. Smith & Sons Co. v. Commissioner. Hall C. Smith, Transferee v. Commissioner.Charles E. Smith & Sons Co. v. CommissionerDocket Nos. 9461, 9462.United States Tax Court1947 Tax Ct. Memo LEXIS 209; 6 T.C.M. (CCH) 529; T.C.M. (RIA) 47128; May 12, 1947Sol Goodman, Esq., 1011 First Nat. Bank Bldg., Cincinnati 2, Ohio, for the petitioner. Cecil H. Haas, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: These proceedings involve deficiencies in income, declared value excessprofits and excess profits tax liability, penalty and transferee liability for the fiscal years ended July 31, 1942, and July 31, 1943. The amounts of the deficiencies and penalty involved are as follows: Declared ValueYearIncomeExcessExcess25%EndedTaxProfits TaxProfits TaxPenalty7-31-42$4,631.16$ 2,679.83$669.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.53$21.8684,611.82The questions presented are as follows: (1) Do the amounts of $52,000 and $87,265.08 paid in the taxable years ended July 31, 1942, and July 31, 1943, respectively, by The Charles E. Smith & Sons Company to Hall C. Smith exceed a reasonable allowance for compensation for services actually rendered by him within the meaning of section 23 (a), I.R.C.? (2) Do the amounts*211 of $23,519.54 and $17,277.70 for the taxable years ended July 31, 1942, and July 31, 1943, respectively, contributed by The Charles E. Smith & Sons Company to a pension trust constitute allowable deductions from gross income under the provisions of sections 23 (a) and 23 (p), I.R.C.? (3) Is petitioner, Hall C. Smith, liable as transferee under the provisions of section 311, I.R.C., for the deficiencies in income tax, declared value excess-profits tax, excess profits tax and penalty, herein determined by respondent to be due from petitioner, The Charles E. Smith & Sons Company, for the taxable years ended July 31, 1942, and July 31, 1943? No issue is raised in either of the petitions filed by petitioners in these proceedings as to the respondent's determination of a penalty for failure of petitioner corporation to file an excess profits return for the fiscal year ending July 31, 1942. Finding of Fact The petitioner, the Charles E. Smith & Sons Company (hereinafter referred to as the "corporation"), is a corporation organized under the laws of the State of Ohio in 1904. Its office and place of business is in Cincinnati, Ohio. It keeps*212 its books and files its returns on the accrual basis. The petitioner, Hall C. Smith (hereinafter referred to as Smith) a resident of Batavia, Ohio, at all times material herein was the president of the corporation and owner of all of its capital stock. In the corporation's Federal income and declared value excess-profits tax return for the fiscal year ending July 31, 1942, a deduction for compensation of Smith, as president, was taken in the amount of $52,000, and a deduction for contribution to pension trust was taken in the amount of $23,519,54. The corporation filed no excess profits tax return for the fiscal year ending July 31, 1942. In its Federal income and declared value excess-profits tax return for the fiscal year ending July 31, 1943, and in its amended return for the same period, the corporation took a deduction for compensation of Smith, as president, in the amount of $87,265.08, and a deduction for contributions to pension trust in the amount of $17,277.70. The corporation filed an excess-profits tax return for the fiscal year ending July 31, 1943. All of the returns filed were filed with the collector of internal revenue for the first district of Ohio at Cincinnati, *213 Ohio. The corporation was organized in 1904 with capital stock of $40,000 divided into 400 shares of $100 each, for the purpose of dealing in and manufacturing men's shirts, and dealing in men's clothing and other articles of wearing apparel. In 1905 the capital stock of the corporation was reduced from $40,000 to $30,000. Smith first became connected with the corporation in 1924, when he was elected president and treasurer, the corporation having previously been owned and operated by his parents and other relatives. From September 19, 1914, until November 15, 1929, the only minutes which appear in the minute book of the corporation are with respect to the years 1924 and 1925. The only minutes appearing therein for the year 1929 are those with respect to a special stockholders' and a special directors' meeting held on November 15, 1929, wherein it is recited that Smith was elected president and treasurer, his mother, Norma H. Smith, was elected vice-president and assistant treasurer, and his sister, Jane A. Smith, was elected secretary, and that they were elected as the three directors. From said November 15, 1929, no minutes appear in the minute book until October 1, 1941. Smith*214 acquired all the capital stock of the corporation in the amount of $30,000 in 1941. On October 15, 1942, he acquired all of an additional issue of 300 shares, and gave the corporation his check for $30,000 on November 12, 1942. On January 7, 1943, the corporation redeemed the 300 shares issued on October 15, 1942, and paid Smith $30,000 therefor. The remaining 300 shares of the par value of $30,000 are still held by him. Prior to the taxable years, the corporation was a small manufacturer of men's shirts and also operated a retail men's furnishings store. The shirt factory had six employees and the store four employees. From 1924 until the outbreak of the war in 1939, eighty per cent of the cloth used in the manufacture of shirts was imported from foreign countries. In the latter part of 1939 and early 1940, the corporation was unable to obtain either foreign or domestic cloth, and, having nothing to sell, was unable to meet its payments to creditors. On August 6, 1940, it filed a petition in the District Court of the United States for the Southern District of Ohio, Western Division, case No. 15439, for the purpose of securing approval of a plan of arrangement with the creditors*215 of the corporation under Chapter 11 of the Federal Bankruptcy Act, as amended. The plan approved by said Court provided for a scaling down of the debts owed by the corporation to its creditors of 35 per cent thereof, pursuant to which the corporation paid its creditors in cash 15 per cent of the amount of the debts, issued a promissory note for 10 per cent of its debts payable without interest on January 10, 1941, and issued a promissory note for 10 per cent of its debts payable without interest on July 10, 1941. Said total payment of 35 per cent of its debts was made by the corporation and final report was made to said court on July 24, 1942. In June or July of 1941, Smith, the president of the corporation, decided to make an effort to secure some war work. The corporation bid on some tow targets for the Army Air Corps and was the low and successful bidder. A contract was entered into under date of October 11, 1941, providing for the manufacture, from materials furnished by the Air Corps. of 30,000 tow targets at prices of $8.68,$11.96, and $13.16 each, less a discount of 3 per cent, the total contract price being $365,087.40. On November 26, 1941, the Air Corps advanced to the*216 corporation the sum of $98,424 to be applied on the purchase price under this contract, which was completed on August 21, 1942. Another contract dated April 12, 1942, provided for the manufacture, from materials furnished by the Air Corps of 66,000 tow targets at a price of $8.08 each, less 3 per cent discount. During the months of June and July, 1942, the Air Corps advanced the sum of $150,000 to be applied upon the purchase price of this contract. This contract was completed on April 6, 1943. The corporation received one contract from the Navy, dated October 22, 1942, under which it furnished a certain quantity of Leno cloth at a total contract price of $20,272.50, which required no manufacturing or processing by the corporation. This cloth was acquired by the corporation from various sources and furnished to the Navy shortly after the date of the contract. During the fiscal year ending July 31, 1944, the corporation entered into the performance of a small prime contract with the Quartermaster Corps and a couple of small subcontracts. At a stockholders' meeting of the corporation dated October, 1941, a resolution was adopted that the salary of Smith be increased to $52,000 a year. *217 Smith was the only stockholder present at this meeting, and knew at the time that the corporation was the low bidder on the first Air corps contract, bids on which had been opened on September 15, 1941. At a meeting of the board of directors of the corporation held on September 3, 1942, a resolution was adopted that Smith's salary for the fiscal year beginning August 1, 1942, be "15 per centum on net sales made by the Company but not to exceed an amount in excess of any limitation on salaries or commissions which may be legally set by action of the United States Congress, except that the minimum amount of salary shall not be less than the amount of salary contract entered into October 1, 1941, by action of the Board of Directors." At the time it acquired the first Air Corps contract, the corporation had some light sewing machines used in making shirts. Heavier machines were found to be necessary for the manufacture of tow targets and Smith arranged for their purchase from the Singer Sewing Machine Company, and made such changes as were necessary on the machines to adapt them to the production of the targets. The new machines and other equipment cost approximately $9,200. The corporation*218 found that its old plant was not large enough and Smith arranged in the spring of 1942 for the purchase of a building 56,000 square feet of floor space. On April 29, 1942, the corporation purchased from The Western Bank and Trust Company, Cincinnati, Ohio, a six-story brick warehouse and factory building, located at 109-117 West Central Parkway, Cincinnati, Ohio, then approximately thirty-five years old, at a total cost of $85,463.85, and allocated such cost on the basis of values for local taxation at $57,983.85 for the building and $27,480 for the land. The corporation made a down payment of $10,000, executed a note to the bank for $5,000, which it paid on July 7, 1942, and executed another note for $70,000 to the bank, payment of which was secured by a first mortgage on the property, payable ten years from date with 4 per cent interest in monthly installments of $518.40. About January 1, 1942, the shirt factory heretofore mentioned was moved from its location at 432 Main Street to the building on West Central Parkway. During the taxable years ending July 31, 1942, and July 31, 1943, Smith devoted all of his time to the war contracts sometimes working sixteen or eighteen hours*219 a day. Although the targets were manufactured in accordance with specifications and blueprints of the Air Corps, Smith found that some changes were necessary in order to facilitate mass production, and as a result spent considerable time traveling to airfields to get changes, which he suggested, approved. The corporation had about 40 sewing machines, which were installed, adjusted and serviced by the service men of the Singer Sewing Machine Company. The Singer service men did not, however, render all the service needed to keep these machines operating efficiently because the employees of the corporation worked on three shifts and the Singer men were not always available when needed. As a result Smith and a mechanic employed by the corporation had to repair the machines from time to time. The following information, except as to the number of employees, appears in the corporation's Federal income tax returns for the fiscal years July 31, 1936 to July 31, 1944, inclusive: 19361937193819391940Net Sales$77,357$90,700$78,200$51,100$42,800Gross Income31,97339,30028,90018,80014,900Net Income1,555307160( 2,522)(16,636)Dividends Paid00000Salary to H. C. Smith6,527.7310,8006,0004,8007,500Compensation of other employees8,3077,72012,14912,210Total Employees (regular)10101098Surplus or Deficit4,1824,2981,752(18,183)1941194219431944Net Sales$38,800$369,800$581,800$75,800Gross Income19,20093,200190,1008,500Net Income( 8,702)3,13637,428(26,446)Dividends Paid003,0000Salary to H. C. Smith4,80052,000 *87,265.08 *17,000 **Compensation of other employees12,24953,14179,50448,088Total employees (regular)6556510Surplus or Deficit(16,104)( 5,023)5,084(21,362)*220 The increase in the corporation's sales in the taxable years 1942 and 1943 was due entirely to war contracts. Of the corporation's total sales of $369,800 in 1942, its prewar shirt business accounted for only $14,903. Of its total sales of $581,800 in 1943, only $17,347 was attributable to its shirt business. In the taxable years 1942 and 1943 approximately one-third of the corporation's employees worked on the shirt business and two-thirds on war contracts. The corporation paid Smith a salary of $52,000 for his services during the fiscal year ending July 31, 1942. All of this salary was paid during the period commencing August 1, 1941, and ending September 15, 1942. The corporation paid Smith a salary of $87,265.08 for his services during the fiscal year ending July 31, 1943. All of this salary was paid during the period beginning August 1, 1942, and ending September 1, 1943. A reasonable allowance for salary or other compensation*221 for personal services rendered to the corporation by Smith during the fiscal year ending July 31, 1942, is $25,000, and during the fiscal year ending July 31, 1943, is $30,000. On May 20, 1942, the board of directors of the corporation adopted a resolution empowering its president to enter into negotiations for the purpose of establishing a pension trust for the benefit of the employees of the corporation, "said trust to be established on an actuarially sound basis." On the same date, a "pension trust agreement" was entered into between the corporation and Cordell Mills, Mary E. O'Mara, and Hall C. Smith, as trustees. These three individuals continued to act as trustees during the time the agreement was in effect and were employees of the corporation. The pension trust agreement provided that the trust was established to provide pensions upon retirement for employees in the form of annuity payments and to provide death benefits prior to retirement of participants. Pensions upon retirement at designated ages were to equal fifty per cent of basis salary received by participants at the time of admission to trust benefits, except that no pension was to be paid in excess of $1,000*222 per month, and monthly pensions were to be calculated on a ten-year certain or life basis. The initial partiipants were to be employees under the age of sixty who had completed four months of service on May 20, 1942. The agreement further provided that the corporation should designate the initial beneficiaries and the amounts of pension to be provided for each of them. This information was set forth in a schedule attached to the agreement. The schedule listed twenty-eight employees, their present age, monthly salary, monthly pension, and retirement age. The monthly salary set forth therein for Smith was $2,084, the monthly pension $1,000, and the retirement age 60. Other pertinent provisions of the agreement are the following: "Fourth * * *"(b) Heads of Departments, under the age of 60, may be selected by the company, based not solely on service, but on their respective value to the business or service, or either of them. All employees, who in the future, complete one year of service with the company, who shall then be under the age of 60, and all the department heads under the age of 60, selected on the above basis, shall be eligible to and shall automatically participate. *223 "(c) That no property, insurance, or annuity contracts, payments or rights hereunder, shall vest in any beneficiary, his designee or any other person until the same shall be by appropriate action of the Trustees hereunder allotted, transferred and paid. "(d) That the Trustees shall be the owners of all policies with full right and power to exercise all policy rights and privileges. "Fifth * * *"(b) That the Company will only to the extent that its earnings and profits are in the discretion and judgment of the Directors of the Company available to pay initially and annually or semi-annually, thereafter to the Trustees, or expend under the discretion on behalf of the Trustees, such funds as may be necessary to purchase and maintain insurance and annuity contracts from some legal reserve life insurance company or companies, satisfactory to the Trustees and to the Company, to provide the benefits intended for the beneficiaries hereinunder sound actuarial principles; "(c) That the Company shall certify to the Trustees in writing the name of each eligible employee and the extent of his participation in the trust, as eligibility requirements are met, provided however that*224 the company shall then pay to the Trustees a sum of money as is sufficient to permit the Trustees to pay an annual or semi-annual premium upon the required contract for such participant, or the company may on behalf of the Trustees make such payment direct to the insurer on behalf of the Trustees. * * *"(d) That the Company assumed no obligation to now or in the future provide the Trustees with the funds necessary to maintain all said contracts in good standing for the full amount of the pension originally provided, but only to furnish funds to the extent that earnings and profits of the company are sufficient in the discretion of the Board of Directors of the Company. "Sixth "Duties of Trustees (a) To purchase from some legal reserve life insurance company or companies approved by the Trustees and by the Board of Directors of the company, insurance annuity contracts on the lives of the beneficiaries of this Trust, for their benefit, to provide for each beneficiary at an age designated in the schedule herein, the monthly pension set forth therein or as may be fixed in any supplementary schedules hereinafter designated and furnished by the company. "(b) Insurance contracts*225 shall be applied for and purchased on the lives of all participants declared insurable by the examining insurer; annuity contracts shall be substituted when possible on the lives of those participants declared uninsurable by the examining insurer. "(c) That the Trustees shall be required to purchase such contracts or to continue the premium payments thereon, only to the extent that funds are provided annually by the company for that purpose; "(d) To hold such insurance or annuity contracts, issued or procured pursuant to the provisions of this Trust, together with any dividends thereon, if any, for the sole benefit of the beneficiaries hereunder, subject to the conditions herein contained, or for the benefit of dependents of such beneficiaries or such persons as may be the objects of the bounty of such beneficiaries. Under no circumstances shall the Company become entitled to receive any part of the earnings, assets or accumulations of this Trust. "(e) Upon the resignation or discharge of any beneficiary under the provisions of this Trust from employment by the company before contract on his life shall have matured, the Trustees shall thereupon at their option and in their sole*226 discretion exercise in writing either: "(1) Surrender the contract on such life for the then cash value thereof and hold such net proceeds for the benefit of the remaining beneficiaries of the Trust, using such funds in the payment of future premiums or payments on unmatured contracts on the lives of the then remaining beneficiaries of this Trust; or "(2) Make available the cash value of the contract on such life to such beneficiary in the same manner as hereinafter provided for the proceeds of contracts which have matured. "(f) Upon any beneficiary of this Trust being laid off from employment temporarily by reason of lack of business or on account of sickness or temporary disability, or for any other reason, the Trustees may, but are not required to, make the contract held for such beneficiary available to him in the same manner as herein provided upon maturity of said contract, and such person shall thereupon cease to be a beneficiary under this Trust in the same manner as an employee permanently separated from the employ of the Company. "(g) Upon the maturity of any insurance or Annuity Contract during the lifetime of the beneficiary, payment thereunder shall be made to*227 the Trustees. The Trustees shall apply the cash value available under such contract for the benefit of such beneficiary, or of the person or persons designated by him in writing as his dependents or the object of his bounty, as in the discretion of the Trustees may be deemed desirable, in one or more of the following methods: * * *"(h) Upon the death of any participant prior to reaching the designated retirement age, the proceeds shall be payable direct to the beneficiaries named in each contract. The participants shall have the right when joined by the Trustees, to name and designate the beneficiary or beneficiaries, who shall be entitled to receive all benefits payable by reason of the death of the respective participants prior to having reached the designated retirement age. In the event that the Trustees shall at any time be named death beneficiaries, such funds shall be used by the Trustees for such purpose as in their sole discretion shall be determined to be for the continuance or perpetuation of the trust for the benefit of the surviving trust participants and others who may subsequently become participants. "(1) Upon the death of any participant prior to the retirement, *228 one-half of the proceeds on the contract or contracts shall be paid to the then trustees and the one-half of the proceeds to the beneficiaries designated by the beneficiaries and approved by the Trustees and all applications for insurance on annuity contracts shall be applied for in such manner. * * *"Seventh "Retirement Ages "The retirement ages for participants shall be in accord with the following schedule and no pension shall be amortized in full in less than (10) ten annual deposits in trust. * * *"Eight "Powers of Trustees "(a) The Trustees, with the consent of the Company, may at any time accelerate the payment of pension income to any beneficiary for such reasons as the Trustees shall deem sufficient, proper and reasonable. "(b) The Trustees may, in their discretion, postpone the payment of pension income beyond the retirement age originally fixed should any beneficiary continue in the employ of the company thereafter, and may apply any funds thereafter transferred to them by the company, designated for such beneficiary for purchase of single premium annuity contracts for the benefit of such beneficiary, maturing at such time as the trustees may*229 determine. * * *"(f) The Trustees are authorized, should the Company fail for any reason to provide funds sufficient to maintain the contracts held by the Trustees, in good standing, and should the Trustees deem it inadvisable to continue the Trust in force, to forthwith make available to each beneficiary the cash value of the contract on his life in the same fashion as is provided for in sub-paragraph (g) Section Sixth. * * *"Ninth "Termination of Trust "(a) The trust hereby created shall cease and terminate or be extended as hereinafter provided, on the happening of any one or more of the following events: "(1) If the Company shall go out of business, cease to exist, be dissolved either voluntarily or involuntarily, have a receiver or trustee in bankruptcy appointed for it; or "(2) If the Company shall exercise its option herein reserved to it, to give written notice to the Trustees at least sixty days prior to May 20th of any year of its intention to make no further payments into the trust, * * *" * * *The pension trust was never approved by the Commissioner of Internal Revenue. The following table shows the contributions made by the corporation*230 to said pension trust for each of the employees of the corporation who were participants therein and the salaries of each of such participants for each of the fiscal years ending July 31, 1942 and July 31, 1943: SalaryAnnual ContributionName ofYear endedYear endedYear endedYear endedParticipant7/31/427/31/437/31/427/31/43Alva Cornett$ 688.00$ 2,173.00$ 283.78$ 283.78Verda Detmiler699.001,451.00388.93388.93Robert Eldred1,590.003,998.001,227.201,227.20Ann Kellenberger624.001,336.00420.06420.06Cordell Mills1,647.003,998.001,451.641,451.64Paul Pax797.002,783.00585.81585.81Mary E. O'Mara632.003,998.001,285.081,285.08Ida Stenn1,147.001,025.000422.71Marie Wuellner878.00949.000481.88Margaret Grovefeld730.00808.000457.08Maggie Conway730.00808.000347.99B. J. Albers1,954.002,205.0001,303.65Jos. Daggett1,890.001,970.0001,075.84Jos. Menzer866.00919.000470.68Sam Sipe320.002,465.0001,465.83June Beatley332.00326.00156.98LeftCora Buhla502.00454.00329.97LeftMargaret Connon700.00703.00178.30LeftLawrence Carlos695.00929.00250.15LeftJosephine Cornerford594.00731.00566.90LeftSophie Ferguson641.001,002.00323.06LeftGertrude Feiler422.00627.00198.24LeftSamuel J. Friedman629.0032.00594.72LeftOval Grant434.00644.00198.24LeftLillian Ingram467.00988.00204.44LeftMargaret G. Miller497.00932.00449.78LeftMarie Pettit329.00421.00385.52LeftMary F. Piersall392.0036.00459.89LeftJohn M. Schuler478.00854.00557.28LeftFreda Sutton586.00593.00463.36LeftJuanita Taylor577.00762.00565.30LeftMary B. Tillery574.00680.00324.85LeftBetty J. Wagner324.00630.00159.62LeftClara Wermescher623.0049.00419.15LeftVelma Wolfson554.00298.00451.54LeftHall C. Smith52,000.0087,265.0810,711.755,591.00Totals$77,542.00$129,842.08$23,591.54$17,259.16*231 The contributions shown above totalling $23,591.54 for the fiscal year ending July 31, 1942, were paid by the corporation to the Crown Mutual Life Insurance Company, a Canadian corporation, on July 23, 1942, in the amount of $29,703.23, less a refund of $6,183.69, and the contributions totalling $17,259.16 for the fiscal year ending July 31, 1943, were paid to the same company on July 31, 1943. About September 6, 1944, the corporation was unable financially to make the contribution required under the plan for the fiscal year ending July 31, 1944, and as a result the trust agreement was terminated by the corporation on or about September 12, 1944, and the contracts held thereunder were assigned and distributed free from the trust to the then participants therein. During the fiscal years ending July 31, 1941, to July 31, 1944, inclusive, the assets, liabilities, and net worth of the corporation, as shown in the balance sheets on its tax returns, were as follows: ASSETS:July 31, 1941July 31, 1942July 31, 1943July 31, 1944Cash$ 881.73$ 44,862.89$ 56,347.61$ 1,071.82Accts. Receivable2,374.2438,792.191,468.629,236.40Bonds10,042.26Inventory100.0056,175.033,052.882,611.71Stamps125.00Total Depreciable assets (less reservefor depreciation)390.0065,963.1647,528.5443,949.04Post War credit600.81600.81Land27,480.0027,480.0027,480.00Treasury Stock30,000.0030,000.00Prepaid items15.5313.0622.52Total Assets$ 3,745.97$233,413.80$176,533.78$114,972.30LIABILITIES: Accounts payable$ 9,551.22$108,579.78$ 14,699.62$ 1,228.90Mortgages payable69,678.9166,280.4162,521.03Accrued expenses27,780.897,614.293,323.42Other liabilities: Payroll tax298.801,097.90427.446,521.49Income and excess profits tax1,300.0322,427.702,739.66Capital stock: common stock30,000.0030,000.0060,000.0060,000.00Deficit(36,104.05)(5,023.71)(21,362.20)Surplus5,084.32Total Liabilities$ 3,745.97$233,413.80$176,533.78$114,972.30*232 The respondent determined that the tax liability of the corporation for the taxable years was as follows: Year endingYear endingJuly 31, 1942July 31, 1943Income tax$4,631.16$ 2,486.38Declared Value Excess-Profits tax21.86Excess Profits tax2,679.83108,401.6825% Penalty669.96Income tax in the amount of $2,460.85 and excess profits tax in the amount of $23,789.86 for the fiscal year ending July 31, 1943, were paid at the time the corporation's original returns for that year were filed. About July 31, 1944, the corporation ceased its manufacturing and other operations with respect to war contracts in the building located at 109-117 West Central Parkway. About August 1944 said machinery and equipment previously acquired by it at a cost of approximately $9,200, as heretofore stated, was sold at approximately 55 per cent of said cost. About January 1, 1945, the corporation ceased its business of manufacturing shirts located in said building. About November 1, 1945, the corporation discontinued its retail business located on East Fourth Street in downtown Cincinnati. On July 20, 1945, a suit was filed in the Common Pleas Court*233 of Hamilton County, Ohio, at Cincinnati, case No. A-93574 by the Western Bank and Trust Company against corporation and others for the balance due of $59,000.07 on said note for the purchase of the property owned by the corporation on Central Parkway, heretofore mentioned, for foreclosure of the mortgage thereon and for the appointment of a receiver to collect rents and other income. Said mortgage was foreclosed and a sale of the property had and from the proceeds of such sale the sum of $60,394.48 was paid to said The Western Bank and Trust Company in satisfaction of its first mortgage; $8,066.45 was distributed to Smith with respect to a second mortgage securing payment of a promissory note in the amount of $7,750 dated July 5, 1945, given by the corporation to him, payment of which was secured by said second mortgage filed in the office of the Recorder, Hamilton County, Ohio, on July 5, 1945. The remainder of the proceeds of said foreclosure sale totaling $30,485.89 is in the hands of the sheriff of Hamilton County, Ohio. A decree of confirmation of said foreclosure, sale and distribution was entered by said court on March 2, 1946. Opinion The first question presented for our*234 determination in these proceedings is - what is a reasonable allowance for compensation for services actually rendered by Smith to the corporation during the fiscal years ending July 31, 1942 and July 31, 1943? The corporation in its income tax returns for the taxable years deducted $52,000 for the fiscal year ending July 31, 1942 and $87,265.08 for the fiscal year ending July 31, 1942, as compensation paid to Smith for services rendered by him during those years. The respondent determined that a reasonable allowance for compensation for Smith for the services he rendered was $25,000 for the taxable year 1942 and $30,000 for the taxable year 1943. This Court has repeatedly pointed out that the burden of proving the reasonableness of salaries paid by a corporation is upon the petitioner. In other words, the petitioner must show that the amounts allowed by the respondent were unreasonably small, since the respondent's determination is presumptively correct. In the instant proceedings we have the rather familiar situation of a corporation all of whose stock was owned by one individual, Smith, who was also its president and general manager. In the years preceding those here involved, *235 the corporation paid him a salary which generally ranged from $4,800 to $7,500, but which amounted to $10,800 in 1937. Its business of manufacturing shirts and operating a small men's furnishings' store had not been very successful, and in 1940 it was forced into bankruptcy. As of July 31, 1941, its balance sheet showed assets of only $3,745.97, composed of cash, notes, accounts receivable, inventory, and furniture and fixtures, as against current liabilities of $9,850.02, and a deficit of $36,104.05. Shortly after the beginning of its next fiscal year, the corporation was the successful bidder on a contract for some tow targets for the Army Air Corps. On October 1, 1941, Smith, whose salary had been $4,800 in the preceding fiscal year, decided that it should be increased to $52,000 per annum, and at a stockholders' meeting on that date a resolution was adopted that his salary should be increased to this amount. Smith was the only stockholder present, and he knew at that time that the corporation was the low bidder on the Air Corps contract, bids for which had been opened on September 15th. When asked why he fixed his salary at that time that the corporation was the low bidder on the*236 Air Corps contract, bids for which had been opened on September 15th. When asked why he fixed his salary at $52,000, he testified that that was what he hoped his services would be worth; that the size of the Air Corps contract had something to do with it; and that he considered the amount of time "it seemed as though I would have to spend on the job." His salary of $87,265.08 for the fiscal year ending July 31, 1943, was likewise authorized by a resolution adopted by him as sole stockholder, and was computed on the basis of 15 per cent of the corporation's net sales for the fiscal year. Petitioners attempted to prove that $52,000 and $87,265.08 constituted a reasonable allowance for salary for Smith by describing in detail the services he rendered. Thus, it was shown that Smith prepared the bids that resulted in the contracts, arranged for the purchase of sewing machines and other necessary equipment and for the purchase of a building sufficiently large to handle the work, hired the personnel, arranged for any financing necessary over and above the advance payments on the contracts made by the government, suggested changes in specifications and blueprints to facilitate mass production, *237 assisted in the repair and servicing of machines, made and recommended new target designs, and spent long hours in the performance of these duties. No evidence was submitted by petitioners, however, indicating that any similar business paid comparable amounts to an officer or officers for services such as were performed by Smith, and cases cited in petitioners' brief as to salaries allowed by this Court as reasonable compensation are of little help inasmuch as the facts presented in those proceedings are not comparable to those here involved. We are not impressed by petitioners' attempt to prove that Smith performed some unique and highly technical services. With certain minor exceptions, the targets were manufactured in accordance with specifications and blueprints furnished by the government, which also furnished most of the cloth used in their manufacture. The principal part of the manufacturing process consisted of cutting the cloth, sewing it together on about forty sewing machines operated by girls, and attaching flotation tubes. The inspector in charge of procurement inspection for the Army Air Corps in the Cincinnati District during the taxable year testified, as a witness*238 for the respondent, that the manufacture of the tow targets was a comparatively simple process, and we have reached the same conclusion after a careful consideration of all the evidence. Our best judgment is that a reasonable allowance for compensation for services rendered by Smith was $25,000 for the fiscal year ending July 31, 1942, and $30,000 for the fiscal year ending July 31, 1943, and we have made such a finding. The second question is whether the amounts of $23,591.54 and $17,277.70, deducted by the corporation as contributions to the pension trust during the taxable years ending July 31, 1942 and July 31, 1943, respectively, constitute allowable deductions from gross income under the provisions of section 23 (a) and 23 (p), I.R.C. Although the corporation deducted the amount of $17,277.70 in its return for the taxable year ending July 31, 1943, its actual contribution amounted to only $17,259.16, as shown in our findings. Section 23 (a), I.R.C. provides that there shall be allowed in computing net income all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including*239 a reasonable allowance for salaries or other compensation for services actually rendered. Section 23 (p), as incorporated in the Internal Revenue Code at the time of its enactment on February 10, 1939, applies to the taxable year ending July 31, 1942, and the same section as amended by the Revenue Act of 1942, applies to the taxable year ending July 31, 1943. Section 162 (d), Revenue Act of 1942. The portinent provisions of section 23 (p) applicable to both years are set forth in the margin. 1*240 The respondent contends that the deduction claimed for the fiscal year ending July 31, 1942, cannot be allowed under section 23 (a) because petitioners have not proved that the amounts paid into the trust fund, when added to the amounts otherwise paid to the employees covered by the trust, were reasonable amounts of compensation for services rendered, and that the deduction claimed for the fiscal year ending July 31, 1943, cannot be allowed under section 23 (a) because section 23 (p), as amended by section 162 (b) of the Revenue Act of 1942, expressly prohibits the deduction of amounts paid into employees' trusts except under the provisions of section 23 (p). An examination of this new provision of section 23 (p) discloses, however, that while it prohibits a deduction being taken under 23 (a), it provides in effect that one of the tests of deductibility under 23 (p) is whether the contribution (without regard to 23 (p)) would be deductible under the provisions of 23 (a). We will therefore first consider whether the contributions made in both taxable years would be proper deductions under the provisions of section 23 (a). The theory underlying the allowance of any deduction under*241 section 23 (a) for contributions made by an employer to a pension trust to provide retirement benefits for employees is that such contributions are in the nature of additional compensation for personal services rendered by the employees included in the plan and represent business expenses. It follows, therefore, that the test of reasonableness applied to compensation for services rendered must be applied to these contributions, and unless it appears from the evidence that the contributions made during a taxable year, when added to other compensation paid to the employee beneficiaries, represent reasonable compensation for their services, the amount of the contributions is not deductible under section 23 (a). The petitioner corporation had the burden of proving this fact, and has not sustained this burden. From the evidence submitted in connection with the first issue we know that any amount paid to the trust for the benefit of Hall C. Smith would result in an unreasonable allowance for compensation for services rendered by him, but as far as the other employees included in the pension plan are concerned, the record is silent as to what constitutes reasonable compensation for them. *242 We cannot assume that payments made by petitioner corporation to the pension trust in their behalf would not result in unreasonable compensation for their services. Under the circumstances we must hold that contributions made by petitioner corporation are not deductible under the provisions of section 23 (a). Phillips H. Lord, 1 T.C. 286, and Gisholt Machine Company, 4 T.C. 699, relied upon by petitioners, wherein deductions were allowed under section 23 (a), are distinguishable from the instant proceedings in that in each of the cited cases this Court was able to find as a fact that the amounts paid into the trust fund, when added to the amounts otherwise paid to the employees, were reasonable amounts of compensation for services rendered. As heretofore noted, the evidence does not permit such a finding in these proceedings. The old and new provisions of section 23 (p) require, as a condition precedent to deductibility of contributions to a pension trust, that the trust be exempt from tax under section 165, I.R.C. We do not deem it necessary to discuss whether the trust here involved meets the requirements of section 165, for, *243 even if it be assumed that it does, it is our view that the conclusion reached under section 23 (a) precludes petitioner from securing deductions for the contributions it made to the pension trust under the old or new provisions of section 23 (p). During the fiscal year ending July 31, 1942, petitioner corporation made contributions to the pension trust of $23,591.54. As heretofore stated, section 23 (p), supra, as incorporated in the Internal Revenue Code in 1939, applies to this fiscal year. The purpose of this section is to permit the deduction from gross income of certain amounts paid to a pension trust which do not represent pension liability accruing during the taxable year, deductible under section 23 (a). Section 23 (p) supplements 23 (a) (see Gisholt Machine Co., 4 T.C. 699, 706( and permits employers who during the taxable year transfer to an exempt employee's trust reasonable amounts representing pension liability applicable to other years or reasonable amounts to place the trust on a sound financial basis, to deduct such amounts, if apportioned in equal parts over a period of ten consecutive years. This provision for additional allowances is not apposite*244 here. We have no evidence that any portion of the contributions made by petitioner corporation to the pension trust during the fiscal year ending July 31, 1942, represented pension liability for any other year than the one in which the contributions were made. In the absence of such evidence, the burden of proof being on petitioners, we must assume that the corporation's contributions aggregating $23,591.54 represent its pension liability for the taxable year. Section 23 (p) does not authorize a taxpayer to deduct any portion of the pension liability for the taxable year that is not deductible under section 23 (a). We have held that no deduction may be taken under the latter section. It follows that no deduction is allowable under section 23 (p). We have heretofore pointed out that no contribution to a pension trust may be taken under the provisions of section 23 (p), as amended by the Revenue Act of 1942, unless such a contribution meets the test of deductibility under section 23 (a), even though the 1942 Act specifically provides that the deduction, if any, must be taken under section 23 (p) and not 23 (a). Inasmuch as the contribution made by petitioner corporation to the pension*245 trust during its fiscal year ending July 31, 1943, does not meet the test of deductibility under section 23 (a), viz., reasonable compensation for services rendered, no deduction can be taken under the provisions of section 23 (p), as amended by the Revenue Act of 1942. The decision of the first two issues in favor of the respondent establishes the liability of the transferor corporation for the deficiencies and penalty determined by the respondent. There remains for consideration the liability of Smith, as transferee. The burden of proving this liability is on the respondent. Petitioners contend that he has not sustained this burden because he has not established that the corporation was made insolvent by the payment it made to Smith either during the taxable year ending July 31, 1942, or July 31, 1943. They also urge that credit or offset should be allowed, in determining transferee liability for whatever income taxes Smith may have paid by reasons of having included in his individual income tax returns the full amounts paid to him during the taxable years. Respondent contends that petitioner Charles E. Smith and Sons Company became insolvent during the fiscal year ending July 31, 1942, and*246 that therefore Hall C. Smith is liable as transferee for the deficiencies and penalty of the transferor corporation for that taxable year. While, as is hereinafter more fully set forth, we do find that Hall C. Smith has a transferee liability for said deficiencies and penalty for the taxable year ending July 31, 1942, we are unable to base such finding upon respondent's contention that Charles E. Smith and Sons Company was insolvent prior to July 31, 1942. Its balance sheet as of July 31, 1942, is in evidence and is set forth in our findings. It discloses that the book value of its assets as of that date exceeded the amount of its liabilities, exclusive of capital stock, by approximately $25,000. There is no evidence that the actual value of the assets at that time was less than the book value. The deficiencies and penalty determined by the respondent against the corporation for the fiscal year ending July 31, 1942, totalled $7,980.95. Even taking into consideration this potential liability for Federal taxes, the corporation was not insolvent at the close of the fiscal year. We cannot hold, therefore, that the distributions to Smith during that year rendered the corporation insolvent, *247 and made him liable as transferee. The events, however, which transpired during the fiscal year ending July 31, 1943, lead us to a different conclusion. As shown in the preceding paragraph, the corporation was solvent at the beginning of that year. The respondent on brief urges that the $30,000 distributed to petitioner on January 7, 1943, in redemption of 300 shares of stock should be considered as one of the distributions which rendered the corporation insolvent and thus created transferee liability. However, no such allegation was made by him in his answer and this item, not being put in issue by the pleadings, cannot be considered by us. The allegation in the answer is limited to the distributions of $92,856.08, made to petitioner for salary and pension. On September 3, 1942, the board of directors adopted a resolution that Smith's salary for the fiscal year ending July 31, 1943, be 15 per cent of its net sales. This amounted to $87,265.08, $57,265.08 of which we have held to be in excess of reasonable compensation for Smith's services for that year. The amount of $5,591 contributed to the pension fund during the year for the benefit of Smith did not constitute a distribution*248 of corporate profits to him. Cf. Lincoln Electric Co., 6 T.C. 37, 51. Our question is whether as a result of the distribution to Smith of $57,265.08 the corporation became insolvent during the fiscal year ending July 31, 1943. If it did, Smith is liable as transferee. If it did not, he is not liable. The balance sheet of the corporation as of July 31, 1943, shown in our findings, shows an excess of assets over liabilities in the amount of $65,084.32. The petitioners contend that, based upon adjusted valuations, the corporation was solvent at the end of the year and could pay any tax owing by it or even the proposed deficiencies determined by the respondent. They urge that the realty was carried at the book value of $75,008.54 against the mortgage obligation of $66,000, leaving an equity of approximately $9,000; that the realty was worth at least the amount of $102,000 received for it at the sheriff's sale in 1945; that at this valuation the equity amounts to approximately $40,000 ($102,000 less $66,000); and that the net worth of the corporation at the end of the fiscal year would amount to $105,000 ($65,084.32 plus $40,000), or more than enough to take care of its*249 tax liability for the fiscal year ending July 31, 1943. Certain adjustments in the corporation's balance sheet as of July 31, 1943, are necessary in order to determine whether the distribution of $57,265.08 made to Smith resulted in the insolvency of the corporation. The item "Treasury Stock - $30,000.00", representing the 300 shares acquired from Smith on January 7, 1943, should be eliminated as an asset, and capital stock liability should be reduced from $60,000 to $30,000. The balance sheet does not reflect the actual value of the realty. It was purchased in April, 1942, at a cost of $85,463.85, and sold at a sheriff's sale in 1945 for $102,000. No evidence was submitted as to its actual value as of July 31, 1943. This was the respondent's burden and in order that petitioners may not be prejudiced by his failure to sustain it, we are making the adjustment to $102,000, as they suggest, although we realize that this figure represents the realty's value in 1945, rather than in 1943, and that its value in 1942 was $85,463.85. The balance sheet carries as the corporation's liability for income and excess profits tax, the amount of $22,427.70. This figure should be adjusted to $118,890.87, *250 which represents the deficiencies and penalty in the aggregate amount of $7,980.95 for the fiscal year ending July 31, 1942, and the corporation's liability for income, declared value excess-profits, and excess-profits taxes aggregating $110,909.92 2 for the fiscal year ending July 31, 1943. "In determining the question of insolvency, a liability for taxes, though unknown at the time, must be considered." Scott v. Commissioner, 117 Fed. (2d) 36. When these adjustments are made, the balance sheet discloses assets of $173,525.24, and liabilities of $207,912.63, exclusive of capital stock, and that the corporation was insolvent. This condition resulted from the aforementioned distribution of $57,265.08 made to Smith, and to the extent of this distribution he is liable as transferee for the deficiencies in tax and penalty determined by the respondent for the fiscal years ending July 31, 1942 and July 31, 1943, Scott v. Commissioner, supra.*251 There remains for consideration petitioners'-contention that a credit or offset should be allowed, in determining transferee liability, for whatever income taxes Smith may have paid by reason of having included in his individual income tax return for the fiscal year ending July 31, 1943, the aggregate of the amounts paid to him by the corporation during that year, as and for salary and other compensation. The same contention was made in J. V. Vandenberge, et al., 3 T.C. 321, 328, aff'd. 147 Fed. (2d) 167, and this Court held that it had not determined any deficiencies in individual income tax against the transferees; that it had acquired no jurisdiction over their individual income tax liabilities and had no power to direct that their liability as transferees be offset by overpayments in their individual income taxes. On the authority of the cited case, we make the same holding in these proceedings. Decision will be entered under Rule 50. Footnotes*. Pension trust contributions in the amounts of $10,711.75 and $5,591.00 for the years 1942 and 1943, respectively, not included in these amounts. ↩**. $35,000 of salary for 1944 waived by H. C. Smith due to lack of funds by corporation to pay same.↩1. Section 23 (p), I.R.C. (1939)[In computing net income there shall be allowed as deductions:] (p) Pension trusts. - (1) General Rule. - An employer establishing or maintaining a pension trust to provide for the payment of reasonable pensions to his employees shall be allowed as a deduction (in addition to the contributions to such trust during the taxable year to cover the pension liability accruing during the year, allowed as a deduction under subsection (a) of this section) a reasonable amount transferred or paid into such trust during the taxable year in excess of such contributions, but only if such amount (1) has not theretofore been allowable as a deduction, and (2) is apportioned in equal parts over a period of ten consecutive years beginning, with the year in which the transfer or payment is made. (2) * * * (3) Exemption of Trusts under Section 165. - The provisions of paragraph (1) and (2) of this subsection shall be subject to the qualification that the deduction under either paragraph shall be allowable only with respect to a taxable year (whether the year of the transfer or payment or a subsequent year) of the employer ending within or with a taxable year of the trust with respect to which the trust is exempt from tax under section 165. Section 23 (p), I.R.C. (as amended by section 162 of the Revenue Act of 1942) [In computing net income there shall be allowed as deductions:] * * * * *(p) Contribution of an Employer to an Employees' Trust or Annuity Plan and Compensation Under a Deferred-Payment Plan. - (1) General Rule. - If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent: (A) In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 165 (a), in an amount determined as follows: * * * * *↩2. This includes the amounts of $2,460.15 for income tax and $23,789.86 for excess-profits tax, paid at the time the returns were filed, plus the deficiencies of $25.53 for income tax, $21.86 for declared value excess-profits tax, and $84,611.82 for excess profits tax.↩